**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| PERFORMANCE CONTRACTING, INC, | No. 88370-4-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| DEPARTMENT OF LABOR AND INDUSTRIES, | |
| Respondent. | |

FELDMAN, J. — Performance Contracting, Inc. (PCI) appeals from a decision of the Board of Industrial Insurance Appeals (Board) affirming a citation issued by the Department of Labor and Industries (Department) for three serious violations of applicable worksite safety regulations. Because the Board's findings are supported by substantial evidence and PCI fails to establish an entitlement to relief, we affirm.

I

On September 20, 2021, Bryan Phillips, an employee of PCI, was fireproofing the ceiling of the fifth floor of the Washington State Convention Center Addition (WSCCA) project, a 1.5 million square-foot building with thirteen floors. He was operating an 11,000-pound motorized work platform, known as a "scissor lift," which elevated him to approximately 27 feet above the floor to perform his

work. As Phillips maneuvered the lift, one of its wheels drove over a 13-inch by 48-inch hole in the concrete floor. The hole was covered by a ¾-inch thick piece of plywood that was coated with concrete slurry, fireproofing materials, and dust. The cover was designed to prevent concrete from falling through the hole to the floor below when the concrete flooring was poured and was not sufficient to support the weight of the scissor lift. Consequently, the scissor lift toppled over and both Phillips and the lift fell from the fifth floor of the WSCCA project to the street below. Phillips died as a result of the fall.

The Department, PCI, and the project's general contractor met at the site later that day to conduct an inspection. They found six rectangular holes in the floor. Following the investigation, the Department issued a citation and notice of assessment citing PCI with the following alleged violations:

**Violation 1 Item 1a**          Violation Type: Serious
WAC 296-869-60030(1)
The employer did not ensure the operator of an elevated work platform kept a safe distance from holes.

**Violation 1 Item 1b**          Violation Type: Serious
WAC 296-880-40015(1)(b)
The employer did not ensure hole covers located at the Washington Convention Center, 1000 Olive Way, Seattle, WA 98101 could support twice the weight of equipment that may be imposed on the cover at any one time.

**Violation 1 Item 2**          Violation Type: Serious
WAC 296-155-110(2)
The employer did not develop an Accident Prevention Program that is tailored to the needs of their particular workplace or operation and to the types of hazards involved.

The Department's penalties for these alleged violations totaled $13,000: $7,000 for items 1a and 1b and $6,000 for item 2.

PCI appealed the citation to the Board. Following a three-day hearing, an Industrial Appeals Judge issued a proposed decision and order affirming the Department's citation. The decision includes detailed findings of fact and conclusions of law. Relevant here, conclusions of law 2, 3, and 4 state as follows:

2. On September 20, 2021, PCI committed a serious violation of WAC 296-869-60030(1), within the meaning of RCW 49.17.180(2) as stated in Item No. 1-1(a) of Citation and Notice No. 317965771. The penalty is $7,000.

3. On September 20, 2021, PCI committed a serious violation of WAC 296-880-40015(1)(b) within the meaning of RCW 49.17.180(2) as stated in Item No. 1-1(b) of Citation and Notice No. 317965771. The penalty is included in Item No. 1-1b.

4. On September 20, 2021, PCI committed a serious violation of WAC 296-869-60030(1), within the meaning of RCW 49.17.180(2) as stated in Item No. 1-2 of Citation and Notice No. 317965771. The penalty is $6,000.

PCI then filed a petition for review to the Board. In its decision and order, the Board ruled:

> After review of the entire record before us, we are persuaded that the Proposed Decision and Order is supported by the preponderance of the evidence and is correct as a matter of law. The Proposed Decision and Order's Findings of Fact and Conclusions of Law are incorporated by reference and adopted as part of this order.

PCI then appealed to the superior court, which affirmed the Board's decision and order. This timely appeal followed.

II

PCI broadly argues the Board's decision is erroneous. Below, we briefly set forth the legal principles that govern our review of the decision and then address, and reject, each of PCI's arguments.

A

The Washington State Constitution mandates protection of workers at construction sites. CONST. art. II, § 35. To that end, article II, section 35 provides, "The legislature shall pass necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health; and fix pains and penalties for the enforcement of the same." In accordance with that constitutional mandate, the Washington legislature enacted the Washington Industrial Safety and Health Act (WISHA) to "assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington." RCW 49.17.010.. The legislature has also delegated broad authority to the Department to adopt regulations to meet the general safety principles set forth in WISHA. RCW 49.17.040. Under WISHA, employers have a specific duty to "comply with the rules, regulations, and orders promulgated" by the Department. RCW 49.17.060(2); *J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus.,* 139 Wn. App. 35, 48, 156 P.3d 250 (2007).

To prove a serious violation of WISHA, the Department must establish: "(1) the cited standard applies, (2) the requirements of the standard were not met, (3) employees were exposed to or had access to the violative condition, (4) the employer knew or through the exercise of reasonable diligence could have known of the violative condition, and (5) there is a substantial probability that death or serious physical harm could result from the violative condition." *Ostrom Mushroom Farm Co. v. Washington State Dep't of Labor & Indus.*, 13 Wn. App. 2d 262, 272, 463 P.3d 149 (2020). The Department "must establish each element by a

preponderance of the evidence." *Centimark Corp. v. Dep't of Labor & Indus.*, 129 Wn. App. 368, 378, 119 P.3d 865 (2005).

Although PCI assigns error to numerous findings, it primarily contests whether the record establishes that it knew or through the exercise of reasonable diligence could have known of the violative condition—the fourth element of a WISHA violation. The Board may prove that element with evidence showing actual or constructive knowledge of the violative condition. *Pro-Active Home Builders, Inc. v. Dep't of Labor & Indus.*, 7 Wn. App. 2d 10, 18, 465 P.3d 375 (2018). "In general, constructive knowledge is established where the employer in the 'exercise of reasonable diligence' could have become aware of the condition." *Id.* (quoting former RCW 49.17.180(6) (2018)). "'Reasonable diligence' includes the obligation of an employer to inspect the work site, anticipate hazards that employees may be exposed to, and take measures to prevent the occurrence of a violative condition." *Bayley Constr. v. Dep't of Labor & Indus.*, 10 Wn. App. 2d 768, 783, 450 P.3d 647 (2019) (quoting *Erection Co. v. Dep't of Labor & Indus.*, 160 Wn. App. 194, 206-07, 248 P.3d 1085 (2011). Constructive knowledge may be established in a number of ways, including evidence showing that the violative condition was readily observable or in a conspicuous location in the area of the employer's crews. *Pro-Active Home Builders,* 7 Wn. App. 2d at 18.

While PCI also assigns error to the superior court's findings in its decision affirming the Board's decision and order, we review the "Board's final order, rather than the superior court's decision, and we sit in the same position as the superior court." *Pro-Active Home Builders*, 7 Wn. App. 2d at 16. The Board's findings of

fact are conclusive if supported by substantial evidence. *Ostrom Mushroom Farm*, 13 Wn. App. 2d at 271. Evidence is substantial if it is sufficient in quantity to persuade a fair-minded person of its truth. *Id.* We view the evidence and all reasonable inferences that can be drawn from that evidence in favor of the prevailing party, here the Department. *Id.* We do not reweigh the evidence on appeal. *Id.* If there is substantial evidence to support the findings of fact, "we review the Board's conclusions of law de novo to determine whether the Board correctly applied the law and whether the Board's findings of fact support its conclusions of law." *Pro-Active Home Builders*, 7 Wn. App. 2d at 16. We also give substantial weight to the Department's interpretation of statutes and regulations within its area of expertise and will uphold that interpretation if doing so does not contradict the legislative intent. *Ostrom Mushroom Farm*, 13 Wn. App. 2d at 272.

B

In conclusion of law 2, the Board affirmed the Department's determination that PCI had violated WAC 296-869-60030(1) by failing to ensure its operator of an elevated work platform kept a safe distance from holes. PCI argues some of the Board's findings relating to this violation—specifically, findings of fact 4, 10, 13, 14, and 15—are not supported by substantial evidence and therefore do not support conclusion of law 2. We address each challenged finding in turn.

1

Finding of fact 4 states "PCI received and utilized the fifth-floor slab plans depicting six rectangular holes along the west side of the fifth floor. PCI had access to other plans depicting the fifth-floor, west-side of the fifth floor, showing the same

six rectangular holes."  Substantial evidence supports this finding.  Documents submitted to the Department during its investigation show that PCI received drawings of the site depicting the planned holes.  The record also shows PCI received flooring plans from the concrete flooring subcontractor on the project depicting six rectangular holes visible on the left (west) edge of the plan, each of which is labeled as an "opening."  Moreover, PCI's branch safety supervisor testified that he reviewed diagrams, drawings, and blueprints and used them as part of his job.  This evidence is sufficient in quantity to persuade a fair-minded person that PCI had access to and utilized plans depicting the holes, and thus the Board's finding is supported by substantial evidence.

PCI claims the Board's finding is not supported by substantial evidence because its *fireproofer employees* did not use flooring plans to conduct their fireproofing work on ceilings.  This argument is not persuasive.  Such a claim, even if true, is of no relevance to whether *PCI* received and utilized plans depicting the hazards, which could have, in the exercise of reasonable diligence, made it aware of the condition.  PCI also takes issue with evidence relied on by the Board by asserting it was "not even on the emails cited in the Board's decision."  But the record reflects that the message regarding the existence of fifth-floor holes was sent to PCI employees Kenneth Wolfe and J.D. Whiteside.  Thus, substantial evidence indicates PCI received and utilized plans and other materials depicting the holes, which in turn supports the finding of constructive knowledge of the violative condition.

Relatedly, PCI argues that despite having received documents showing the holes months before the accident, it was the general contractor and flooring sub-contractor's responsibility to provide notice of uncorrected hole hazards at the site and that the general contractor should not have "released" the fifth floor to PCI if it was not safe. This argument fails because PCI cannot contract away its obligation to keep its employees safe. Both subcontractors and general contractors have a "duty to comply with or ensure compliance with WISHA and its regulations." *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 463, 788 P.2d 545 (1990); RCW 49.17.060(2). The duty of a general contractor does not lessen the duty of a subcontractor because "[a]n employer has a positive, nondelegable duty to furnish [its] employees with a reasonably safe place to work." *Guy v. Nw. Bible Coll.*, 64 Wn.2d 116, 118, 390 P.2d 708 (1964). As confirmed recently in *Vargas v. Inland Wash., LLC*, "multiple entities—jobsite owners, general contractors, subcontractors—may concurrently owe independent yet overlapping duties to maintain a safe workplace." 194 Wn.2d 720, 739, 452 P.3d 1205 (2019). Contrary to PCI's argument, substantial evidence supports finding of fact 4.

2

Finding of fact 10 states "on September 17, 2021, PCI monitored fireproof work progress on the fourth-floor ceiling, and the fifth-floor rectangular hole covers were visible." PCI presents no argument as to how this finding is not supported by substantial evidence. Because "it is incumbent on counsel to present the court with argument as to why specific findings . . . are not supported by the evidence and to cite to the record to support that argument," *In re Estate of Lint*, 135 Wn.2d

518, 532, 957 P.2d 755 (1998) (citing RAP 10.3), we treat this unchallenged finding as a verity on appeal. *Frank Coluccio Const. Co. v. Dep't of Labor & Indus.*, 181 Wn. App. 25, 35, 329 P.3d 91 (2014). In any case, substantial evidence supports the challenged finding, including PCI's photographs of the fourth floor ceiling three days before the incident showing the underside of the plywood covering the holes on the fifth floor. This evidence supports the Board's determination that PCI had constructive knowledge of the hazard because it could have known of the violative condition in the exercise of reasonable diligence.

3

Finding of fact 13 provides, "The pre-task plan in effect on September 20, 2021, did not require inspecting for potentially concealed hole hazards, and the pre-task plan did not require inspecting for holes." Substantial evidence supports this finding. PCI employees used pre-task plans to check an area for potential hazards prior to beginning their work each day. The pre-task plans PCI used at the WSCCA project in the weeks leading up to Phillips' death included questions designed to evaluate the floor and safety of hole coverings at the worksite, such as, "Is the surface of sufficient strength to withstand all floor/ground load forces?" and "Are there drop-offs or holes, including those concealed by water, ice, mud, etc?" But the record shows that the pre-task plan changed days before Phillips' death. On the day of the accident, it no longer included the above questions in the "evaluating work area" section of the plan and did not require employees to look for holes, concealed or otherwise, before beginning work each day. Thus, substantial evidence supports the challenged finding. Equally important, the

previous iteration of the pre-task plan also supports the Board's determination that PCI, had it exercised reasonable diligence, could have become aware of the violative condition.

4

Finding of fact 14 states, "On September 20, 2021, at about noon, one of the six rectangular holes covers [was] depressed, damaged, and readily visible as a hole cover." Substantial evidence supports this finding. As the Board noted, a PCI vice president testified that at 9:11 am on the day Phillips died, materials were situated on top of an area where a depressed hole cover was later discovered, thus making it undiscoverable as of the beginning of the day. But Phillips did not begin working on the fifth floor until noon. Importantly, Phillips' foreman testified that when he inspected the fifth floor with Phillips around noon—the specific time referenced in finding of fact 14—he did not observe any materials obstructing the area where the depressed hole cover was later found, indicating any materials had been moved since earlier in the morning. A PCI photograph of the project at 1:13 pm, about 45 minutes before Phillips' death, also shows that any material that had been covering the hole in the morning had been removed. This, too, supports the Board's finding that one of the six rectangular hole covers was depressed, damaged, and readily visible as a hole cover.

PCI challenges the Board's finding by claiming that the hole at issue was "45 feet away from where PCI was working" and no one testified that they noticed it before the incident. But actual knowledge of the hazard is not required. Had PCI exercised reasonable diligence to inspect the area of the worksite, anticipate

hazards that employees may be exposed to, and take measures to prevent the occurrence of a violative condition, it could have known about the risks of driving an 11,000 pound scissor lift in an area of the project where there was at least one hole covered by depressed and damaged plywood. Furthermore, in asking the court to disregard documentary evidence in favor of its employee's testimony, PCI improperly invites the court to reweigh the evidence. *See Ostrom Mushroom Farm*, 13 Wn. App. 2d at 271. Substantial evidence supports the challenged finding, which in turn supports the Board's determination that PCI had constructive knowledge of the hazard.

5

Finding of fact 15 provides, "On September 20, 2021, the rectangular hole covers in the area where Mr. Phillips was working were visible." In support of this finding, the Board noted, "the photographic evidence taken . . . demonstrates the holes were visible" and "[a]s shown by the admitted photographs, the depressed hole, and the rectangular outlines of the covered holes were visible." Substantial evidence supports the finding, including photographs of the covered holes showing that the rectangular outlines are readily observable to the naked eye.

PCI nevertheless contends the hole covers could not be observed visually, it is not required to conduct "detective work," and it therefore could not have anticipated the hazard. But as noted above, photographic evidence contradicts PCI's factual assertion. And the possibility of drawing different conclusions from the evidence does not prevent the Board's findings of fact from being supported by substantial evidence. Furthermore, we view the evidence and all reasonable

inferences that can be drawn from that evidence in favor of the Department (the prevailing party below), and we do not reweigh the evidence on appeal. *Ostrom Mushroom Farm*, 13 Wn. App. 2d at 271. For all these reasons, substantial evidence supports finding of fact 15.

6

Finally, finding of fact 17 states, "On September 20, 2021, PCI had knowledge, or with the exercise of reasonable due diligence should have known, of the six rectangular holes and hole covers along the west-edge of the fifth floor of the WSCCA project." As discussed above, the Department presented substantial evidence that supported the finding that PCI exposed Phillips to a hazard. As PCI had access to documents showing six large holes were planned on the fifth floor, it could have become aware of the condition and anticipated the hazard to Phillips' safety. Furthermore, PCI observed the hole coverings from below, on the fourth floor, just days prior to Phillips' death, which further supports the Board's determination that PCI had constructive knowledge of the violative condition since PCI could have used that information in the exercise of reasonable diligence to anticipate the hazard.

At the hearing before the Board, PCI repeatedly emphasized that it relied on visual inspections to ensure hole covering safety, yet it failed to note the rectangular outlines of the hole coverings in its work area and failed to notice the depressed and damaged hole cover near the work area on the day Phillips died. When asked, "how does PCI as a subcontractor verify whether holes are properly covered?" a PCI branch safety supervisor responded, "[v]isual inspections." But

as noted previously, PCI had removed the question asking about concealed hole hazards in the pre-task plans used the day of Phillips' death. The decision is bewildering given PCI's own training about the risk of holes while operating scissor-lifts. Indeed, PCI's safety training materials state, "[d]ropping a wheel in a hole or off an edge with subsequent tip-over" is one of the "big three (3) in accidents" involving a scissor lift.

Particularly when viewed in the light most favorable to the Department, substantial evidence supports the Board's finding that PCI had constructive knowledge of the violative condition. As stated above, "constructive knowledge is established where the employer in the 'exercise of reasonable diligence' could have become aware of the condition." *Pro-Active Home Builders*, 7 Wn. App. 2d at 18 (quoting former RCW 49.17.180(6) (2018)). Reasonable diligence "includes the obligation of an employer to inspect the work site, anticipate hazards that employees may be exposed to, and take measures to prevent the occurrence of a violative condition." *Bayley Constr.*, 10 Wn. App. 2d at 783. The Department presented substantial evidence that the holes were readily observable and in a conspicuous location in the area of PCI's crew. Had PCI exercised reasonable diligence by identifying the large holes in the blueprints, inspecting the surface of the fifth floor after observing the plywood covers from below several days prior to the incident, or conducting more thorough visual inspections with adequate pre-task plans, it could have discovered the hole hazards.

\*   \*   \*

In sum, substantial evidence supports the challenged findings, and the Board's findings support its conclusion (as stated in conclusion of law 2) that PCI violated WAC 296-869-60030(1) by failing to ensure its operator of an elevated work platform kept a safe distance from holes.[1]

C

In conclusion of law 3, the Board affirmed the Department's determination that PCI had violated WAC 296-880-40015(1)(b) by failing to ensure hole covers at the work site could support twice the weight of the equipment that may be imposed on the cover at any one time. The Board addressed this issue in finding of fact 24, which states, "PCI did not require the hole covers to be capable of supporting, without failure, at least twice the weight of the employees, equipment, and materials that may be imposed on the cover at any one time." Although PCI assigns error to this finding, it offers no substantive challenge to the finding other than to assert it could not have made its workplace safe for employees by sufficiently covering holes it did not know about. Because it fails to engage in the required analysis regarding this finding, it is a verity on appeal. *Frank Coluccio Const.*, 181 Wn. App. at 35. In any event, the finding is supported by substantial

---

[1] PCI complains in its briefing that much of the evidence supporting the citations consists of what it characterizes as "post-incident photographs," "hindsight," and "post-investigation detective work." PCI similarly asserted at oral argument that the Department had failed to prove its citations with "pre-incident evidence." Wash. Ct. of Appeals oral argument, Performance Contracting, Inc. v. Dep't of Labor & Indus., No. 88370-4-I (April 9, 2026), at 0 min., 59 sec. (on file with court). But as PCI's counsel acknowledged on rebuttal, no reported decision supports this temporal distinction. Oral argument at 18 min., 50 sec. Where, as here, "a party provides no citation to support an argument, this court will assume that counsel, after diligent search, has found none." *State v. Loos*, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020). Nor does such a temporal distinction make logical sense here, as the information gathered by the Department *after* the accident—such as plans depicting the holes, the depressed hole cover, and the visible outline of the rectangular holes as shown in numerous photographs—was available to PCI *before* the accident through the exercise of reasonable diligence.

evidence.  At the hearing, PCI repeatedly stated it has no internal procedure to verify the sufficiency of hole coverings, instead instructing employees to simply avoid covered holes.  During the hearing, when asked "So in your role as the safety foreman, does it include assessing or working with one of the engineers at PCI to verify what weight bearing a particular hole may or may not have?" the PCI employee replied, "As a policy and a rule, we don't drive over hole covers."  *Id.* Then, when asked "in terms of confirming that covers can withstand a certain weight, how is that confirmed?" the employee stated "We don't drive over hole covers.  It's not even something that I really need to worry about.  We are not hitting those.  That standard is for [other parties] to build the hole covers."  And when a PCI Vice President was asked, "What is PCI's practice for confirming the weight-bearing limit of a covered hole?" he replied "we do not confirm" and noted that PCI relies on other parties to follow the work site's guidelines about the strength of hole covers without verifying they do so.

This evidence supports the finding that "PCI did not require the hole covers to be capable of supporting, without failure, at least twice the weight of the employees, equipment, and materials that may be imposed on the cover at any one time."  Accordingly, we affirm the Board's determination—as stated in finding of fact 24 and conclusion of law 3—that PCI violated WAC 296-880-40015(1)(b).

D

Lastly, the Department cited PCI for violating WAC 296-155-110(2), which states that employers "must develop a formal accident-prevention program, tailored to the needs of the particular plant or operation and to the type of hazard

involved." In finding of fact 29, the Board found that "PCI's site-specific safety plan was inadequate because it does not include any requirements for hole covers, hole hazards, and driving elevating work platforms on or near holes, depressions, and other hazards." Substantial evidence supports this finding. Although PCI had a site-specific "Safety & Health Manual" for the WSCCA project, the plan did not specify how PCI employees should prevent accidents related to holes or hole coverings, nor did it require them to check for holes or hole coverings while operating motorized vehicles. It indicates employees should complete "pre-task plans" as part of daily site reviews, which, as discussed above, did not include searching for hole hazards on the day Phillips died.

In response to this determination, PCI argues that the Board improperly shifted the Department's burden to prove a serious violation of WISHA to PCI by "fault[ing] PCI for not introducing [its Accident Prevention Program (APP)] and treat[ing] the site-specific plan's omissions as proof of a violation." According to PCI, it maintains "roughly a 500 page" APP that operates as the "general" "master safety plan for PCI." PCI further claims that the APP addresses holes and floor coverings. And lastly, it argues it was not required to offer this document into evidence because "it was the Department's burden to prove each alleged violation at trial by a preponderance of evidence."

PCI's argument ignores the WISHA requirement that the employer maintain a safety plan *tailored to the particular worksite*. Even if PCI's master APP addresses hole cover hazards generally (a claim which cannot be verified because the APP was not entered into evidence), nowhere in PCI's site-specific plan are

employees directed to the APP for information related to holes. Nor does the plan generally direct employees to the APP as a purported "master" safety plan. And nor are employees instructed in the site-specific plan to review the APP. In fact, the WSSCA site-specific plan only refers to the APP regarding the management of subcontractors and silica exposure. On this record, PCI's burden shifting argument easily fails.

As with the other challenged findings, substantial evidence supports the Board's determination—as stated in finding of fact 29 and conclusion of law 4—that PCI violated WAC 296-155-110(2).[2]

III

We affirm the Board's decision and order and, accordingly, affirm the superior court's decision on judicial review.

_Feldman, J._

WE CONCUR:

_____        _____

---

[2] Together with its challenge to finding of fact 29, PCI challenges finding of fact 37, which states that "PCI did not adequately communicate its safety rules to employees." Although PCI repeatedly asserts this argument alongside its argument regarding finding of fact 29, finding of fact 37 is not relevant to the Board's determination that PCI violated WAC 296-155-110(2). And the Board did not rely on finding of fact 37 in concluding that PCI had committed a serious violation of WAC 296-155-110(2). Instead, the finding is relevant to an affirmative defense based on unpreventable employee misconduct, which PCI asserted at the outset of the hearing and later abandoned. Consistent with that abandonment, PCI does not challenge the Board's conclusion of law 5 regarding this issue. Thus, as the Department correctly argues, we need not determine whether substantial evidence supports the Board's finding that PCI did not adequately communicate its safety rules to employees.